Matter of Pierre-Louis v New York State Justice Ctr. for the Protection of People with Special Needs (2020 NY Slip Op 02308)





Matter of Pierre-Louis v New York State Justice Ctr. for the Protection of People with Special Needs


2020 NY Slip Op 02308


Decided on April 16, 2020


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: April 16, 2020

529116

[*1]In the Matter of Cassandre Pierre-Louis, Petitioner,
v
New York State Justice Center for the Protection of People with Special Needs et al., Respondents.

Calendar Date: February 10, 2020

Before: Lynch, J.P., Clark, Devine, Pritzker and Reynolds Fitzgerald, JJ.


Schlissel DeCorpo LLP, Lynbrook (Ronald P. Perry of counsel), for petitioner.
Letitia James, Attorney General, Albany (Kathleen M. Treasure of counsel), for respondents.



Pritzker, J.
Proceeding pursuant to CPLR article 78 (transferred to this Court by order of the Supreme Court, entered in Albany County) to review a determination of respondent Justice Center for the Protection of People with Special Needs denying petitioner's request to amend a report of abuse and neglect.
Petitioner is employed by Extraordinary People in Care, a day habilitation program that is certified by respondent Office for People with Developmental Disabilities. Petitioner's job title is Direct Service Professional (hereinafter DSP), and she is responsible for maintaining the safety and care of the service recipients, who are all individuals with disabilities. In November 2015, respondent Justice Center for the Protection of People with Special Needs received a report alleging that petitioner committed physical abuse when she "yelled at a service recipient excessively and/or hit him with a paper towel roll as a behavior intervention." Following an investigation, the Justice Center substantiated the report, finding that petitioner committed category three physical abuse and category three neglect. In November 2015, petitioner requested to amend the report to unsubstantiated, which was denied by respondent Administrative Appeals Unit of the Justice Center, and the matter was referred for an administrative hearing. After a hearing, an Administrative Law Judge (hereinafter ALJ) issued a recommended decision finding that the evidence established, by a preponderance of the evidence, that petitioner physically abused and neglected the service recipient. In its final determination, the Justice Center adopted the ALJ's recommended decision in its entirety and denied petitioner's request to amend the substantiated report. Petitioner then commenced this CPLR article 78 proceeding to annul the Justice Center's final determination as unsupported by substantial evidence, which Supreme Court transferred to this Court.
"A final administrative determination rendered following a hearing will be confirmed by this Court so long as there is substantial evidence in the record to support it. Notably, if substantial evidence is present in the record, this Court cannot substitute its own judgment for that of [the Justice Center], even if a contrary result is viable" (Matter of Stewart v Justice Ctr. for the Protection of People with Special Needs, 173 AD3d 1411, 1412-1413 [2019] [internal quotation marks, brackets and citations omitted]; see Matter of Roberts v New York State Justice Ctr. for the Protection of People with Special Needs, 152 AD3d 1021, 1024 [2017]). Further, this Court "'will not weigh conflicting testimony or second guess the credibility determinations of the administrative factfinder'" (Matter of Perez v New York State Justice Ctr. for the Protection of People with Special Needs, 170 AD3d 1290, 1293 [2019], lv denied 34 NY3d 903 [2019], quoting Matter of Stephen FF. v Johnson, 23 AD3d 977, 978 [2005]). As relevant here, "physical abuse" is defined as any "conduct by a custodian intentionally or recklessly causing, by physical contact, physical injury or serious or protracted impairment of the physical, mental or emotional condition of a service recipient or causing the likelihood of such injury or impairment" (Social Services Law § 488 [1] [a]; see Matter of Roberts v New York State Justice Ctr. for the Protection of People with Special Needs, 152 AD3d at 1023). Additionally, "neglect" is defined as "any action . . . that breaches a custodian's duty and that results in or is likely to result in physical injury or serious or protracted impairment of the physical, mental or emotional condition of a service recipient" (Social Services Law § 488 [1] [h]; see Matter of Preece v New York State Justice Ctr. for the Protection of People with Special Needs, 176 AD3d 1365, 1368-1369 [2019]).
At the administrative hearing, Allen Siegel, the Director of Day Services at Extraordinary People in Care, testified that the service recipient is severely developmentally disabled and nonverbal, and the record further reveals that he has multiple diagnoses, including Lennox-Gastaut Syndrome, which is a severe form of epilepsy, profound mental retardation and intermittent explosive disorder. The record indicates that the service recipient is unable to communicate with words and "requires total staff assistance" when using the bathroom, bathing and other personal hygiene care. The service recipient, despite being middle aged, is unable to put on or remove his shoes "appropriately" and always requires a diaper. Despite these profound special needs, the service recipient enjoys many activities, including interacting with staff, music, playing various games and sports as well as visiting the mall. In our view, the service recipient is precisely the type of "vulnerable person" that Social Services Law article 11 is designed to protect (see Social Services Law § 488 [15]).
Siegel testified regarding his investigation into the incident regarding petitioner and the service recipient. One of petitioner's coworkers, Tierra Baker, who is also a DSP, was working in the room with petitioner when the incident occurred and informed Siegel that she observed, from an unobstructed vantage point approximately 10 feet away, petitioner hit the service recipient with her hand and a paper towel roll several times on the head and shoulder while yelling at him. Baker described the strength of the strikes as an 8 on a scale from 1 to 10, 1 being very lightly and 10 being hard. Siegel also testified that Gillian Russell, another DSP who was present in the room when the incident occurred, reported observing, from an unobstructed view approximately 15 feet away, petitioner strike the service recipient "about 10 times" on the head with a paper towel roll, with the strikes being "quite hard." Siegel testified that he asked Russell to demonstrate how hard petitioner hit the service recipient by hitting Siegel on his head with a paper towel roll. Siegel testified that Russell did so and that "[i]t was quite hard." Siegel testified that petitioner, who demonstrated hitting the service recipient with a paper towel roll, also demonstrated how hard she did so by hitting Siegel. Unlike Russell's demonstration, Siegel testified that petitioner "tapped [him] lightly on [his] head." After Russell observed this, she redirected the service recipient to the other side of the room. Russell and Baker were the only two staff members to observe the incident. The only staff member with a recollection controverting their accounts was petitioner.
Petitioner testified at the administrative hearing that, on the day of the incident, she was assigned to a room with Russell, Baker, the service recipient and 9 or 10 other individuals. While petitioner was doing paperwork, the service recipient approached another individual who pushed him away. He then approached a second individual — who was less capable of pushing him away — and he inappropriately touched her and she screamed "no." Petitioner raised her voice in an attempt to distract the service recipient and stop the behavior, but that did not work. Although she was initially evasive about her use of a paper towel roll, petitioner ultimately admitted that she then tapped the service recipient twice on the head and twice on the arm with the paper towel roll, which redirected his attention on petitioner, who he then tried to touch. Petitioner explained that Russell then assisted by turning the service recipient around, after which he went to the other side of the room. Petitioner stated that her approach to redirect the service recipient was "a little bit unorthodox." Petitioner testified that she was familiar with the service recipient and had been trained on his behavioral support plan (hereinafter BSP), which specifically addressed the behavior he was engaging in the day of the incident. The service recipient's BSP is contained in the record and, although redirection is mentioned when the service recipient has these behaviors, there is no mention of physical contact, much less hitting or tapping on the head, as a means of redirection.
Petitioner argues that the Justice Center's proof was contradictory and failed to establish that her actions caused injury or a likelihood of injury. Although petitioner's recollection of the intensity of the contact with the service recipient and the number of strikes conflicts with the accounts of Baker and Russell, the ALJ was free to make a credibility determination in light of the conflicting testimony and lack of other witnesses (see Matter of Perez v New York State Justice Ctr. for the Protection of People with Special Needs, 170 AD3d at 1293; Matter of Stephen FF. v Johnson, 23 AD3d at 978). Also, petitioner's initial evasiveness regarding the use of a paper towel roll provided the ALJ with a reason to question the veracity of her testimony. Further, while petitioner testified that both Baker and Russell were motivated to lie and disputed the level of velocity with which she came into contact with the service recipient, this also presented a credibility issue for the ALJ to resolve (see Matter of Perez v New York State Justice Ctr. for the Protection of People with Special Needs, 170 AD3d at 1293; Matter of Stephen FF. v Johnson, 23 AD3d at 978). Even crediting petitioner's account, the uncontroverted evidence shows that she repeatedly made contact with the service recipient's head multiple times with a paper towel roll. Accordingly, given the legion of disabilities that inflict the service recipient, including a severe form of epilepsy, substantial evidence supports a finding that petitioner hit the service recipient with significant force and, in so doing, recklessly caused a likelihood of "physical injury or serious or protracted impairment of the physical, mental or emotional condition of [the] service recipient" so as to constitute abuse (Social Services Law § 488 [1] [a]; see Matter of Roberts v New York State Justice Ctr. for the Protection of People with Special Needs, 152 AD3d at 1023).[FN1] Finally, although "[p]hysical abuse shall not include reasonable emergency interventions necessary to protect the safety of any person" (Social Services Law § 488 [1] [a]), any suggestion that petitioner's conduct constituted reasonable emergency intervention to protect the safety of other service recipients is defeated by the uncontroverted evidence that Russell directed the service recipient away from petitioner and the other service recipient without striking him.
The same substantial evidence supports a finding that petitioner committed neglect. As a DSP, petitioner is responsible for maintaining the safety and care of the service recipients, who are all individuals with disabilities, which includes following any plans in place, including BSPs. The service recipient's BSP provides for preventative and corrective techniques when the service recipient is engaging in inappropriate touching, but none involves hitting or "tapping." Siegel maintained that, as a DSP, petitioner was trained on the service recipient's BSP and was expected to know and follow it, even when it is ineffective. Petitioner testified that she received training on the service recipient's BSP and admitted that it directs DSPs to provide him with stimulating activities to direct him away from inappropriate touching, but that she did not attempt to provide him with a stimulating activity or object to redirect him. Petitioner's testimony, which suggested that her "unorthodox" methods were necessary, is again belied by the evidence that Russell successfully escorted the service recipient to the other side of the room without striking him. Accordingly, because petitioner unnecessarily deviated from the service recipient's BSP, substantial evidence indicates that her actions breached her duty to maintain the safety and care of the service recipient and that such breach was likely to result in "physical injury or serious or protracted impairment of the physical, mental or emotional condition" of the service recipient (Social Services Law § 488 [1] [h]). We have reviewed petitioner's remaining contentions and find them to be without merit.
Lynch, J.P., Clark, Devine and Reynolds Fitzgerald, JJ., concur.
ADJUDGED that the determination is confirmed, without costs, and petition dismissed.



Footnotes

Footnote 1: Petitioner's additional argument, that evidence of injury is "necessary for a finding of physical abuse," simply misstates the law (see Social Services Law § 488 [1] [a]).